## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| **PHILLIP MARCH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:11CV 1334 LMB** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Phillip March for a Period of Disability and Disability Insurance Benefits under Title II of the Social Security Act, and Supplemental Security Income under Title XVI of the Act.  This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties.  See 28 U.S.C. § 636(c).  Plaintiff filed a Brief in support of the Complaint.  (Doc. No. 19).  Defendant filed a Brief in Support of the Answer.  (Doc. No. 23).  Plaintiff has filed a Reply.  (Doc. No. 25).

## Procedural History

On March 6, 2009, plaintiff filed his application for benefits, claiming that he became unable to work due to his disabling condition on April 25, 2007.  (Tr. 87-96).  This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated April 23, 2010.  (Tr. 50-54, 35-47).  Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the

Social Security Administration (SSA), which was denied on May 23, 2011.  (Tr. 7, 1-5).  Thus, the decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.   ALJ Hearing

Plaintiff's administrative hearing was held on February 23, 2010.  (Tr. 10).  Plaintiff was present and was represented by counsel.  (Id.).  Also present was vocational expert Vincent Stock.  (Id.).

The ALJ questioned plaintiff, who testified that he was thirty-three years of age and had obtained a GED.  (Tr. 12).  Plaintiff stated that he lived in an apartment with his two daughters, who were aged thirteen and ten.  (Id.).

Plaintiff testified that he last worked in February of 2007.  (Tr. 13).  Plaintiff denied that he told doctors at Barnes Hospital that he did not take his medication because it interfered with his work.  (Id.).  Plaintiff testified that he stopped working as an investigator in February of 2007 because he planned to start a new business.  (Id.).  Plaintiff stated that he was stabbed in April of 2007.  (Id.).

The ALJ noted that plaintiff had no reported income after 2004.  (Id.).  Plaintiff testified that he was working but he did not file income taxes.  (Tr. 14).

Plaintiff stated that he was unable to work because he is not able to lift his left arm fully, and his medications cause drowsiness and memory difficulties.  (Id.).  Plaintiff testified that he

takes Tegretol,[1] Neurontin,[2] and Nortriptyline.[3]  (Id.).  Plaintiff stated that, as a result of these

medications, he feels nervous, unsteady, and is unable to concentrate.  (Id.).  Plaintiff testified that

he has told his doctors about these side effects, but his medications have not been changed.  (Id.).

Plaintiff stated that he experiences constant pain in the left side of his jaw.  (Id.).  Plaintiff

testified that he went to the emergency room frequently to obtain narcotics for his pain.  (Tr. 14-

15).  Plaintiff stated that, in 2007, he received frequent emergency room treatment at Barnes

Hospital due to an infection in his face after he underwent surgery.  (Tr. 15).  Plaintiff testified

that he continued to experience pain after he was treated for the infection, and eventually went to

DePaul Hospital where he was admitted for two weeks.  (Id.).  Plaintiff stated that he was

diagnosed with an infection in his throat and neck, and a plate had to be removed from his face.

(Id.).

Plaintiff testified that he underwent surgery in April 2009 for Eagle syndrome.[4]  (Tr. 16).

Plaintiff stated that his face was still swollen at the time of the hearing as a result of the surgery.

(Id.).

Plaintiff testified that he last consumed alcohol on New Year's 2010.  (Id.).  The ALJ

noted that plaintiff was found to be intoxicated when he was involved in a motor vehicle accident

---

[1]Tegretol is indicated for the treatment of trigeminal neuralgia.  See Physician's Desk
Reference, ("PDR"), 3019 (63rd Ed. 2009).

[2]Neurontin is indicated for the treatment of nerve pain.  See WebMD,
http://www.webmd.com/drugs (last visited September 18, 2012).

[3]Nortriptyline is an antidepressant indicated for the treatment of mood disorders and nerve
pain.  See WebMD, http://www.webmd.com/drugs (last visited September 18, 2012).

[4]Pain and inflammation due to overlong styloid process or calcification about the
stylohyoid ligament.  Stedman's Medical Dictionary, 1897 (28th Ed. 2006).

in February 2009.  (Id.).  Plaintiff testified that he was not intoxicated, and that he had only consumed one alcoholic drink.  (Id.).

Plaintiff stated that he did not have a primary care physician.  (Id.).  Plaintiff testified that he recently was approved for Medicaid benefits.  (Tr. 17).

Plaintiff stated that, during a typical day, he does "nothing."  (Id.).  Plaintiff testified that his daughters attend school, and he tries to go to the gym "for maybe a[n] hour or something." (Tr. 17-18).  Plaintiff stated that he takes care of his apartment.  (Tr. 18).  Plaintiff testified that he cooks microwave meals for his family.  (Id.).  Plaintiff stated that his daughters do the laundry and cleaning.  (Id.).  Plaintiff testified that he sleeps for most of the day while his daughters are in school.  (Id.).

Plaintiff stated that he was able to walk for about a quarter of a mile, and stand for forty-five minutes to one hour.  (Id.).  Plaintiff testified that he does not have a shoulder blade on one side due to the stabbing.  (Tr. 19).  Plaintiff stated that the stabbing killed the nerve in his arm, and he is unable to move his right arm.  (Id.).  Plaintiff testified that he has difficulty sitting due to shoulder and neck pain.  (Id.).  Plaintiff stated that he is able to sit for about two hours.  (Id.). Plaintiff testified that he was able to lift eighty pounds.  (Id.).

Plaintiff stated that he does not see an ENT for his cheek because his ENT tells him there is nothing wrong with him.  (Tr. 20).  Plaintiff testified that he sees a neurologist, and that he had been seeing the neurologist for about a year-and-a-half.  (Tr. 21).

Plaintiff's attorney examined plaintiff, who testified that his pain is increased when he eats hot, spicy, or sour foods.  (Id.).  Plaintiff stated that chewing occasionally worsens his pain.  (Id.). Plaintiff testified that the medication he takes decreases his pain somewhat, but does not eliminate

the pain.  (Tr. 22).  Plaintiff stated that he does not have difficulty speaking.  (Id.).  Plaintiff

testified that he often has difficulty eating due to the pain.  (Id.).

Plaintiff stated that he experiences difficulty remembering due to his medications.  (Id.).

Plaintiff testified that his medication also causes drowsiness, difficulty concentrating, and

nervousness.  (Tr. 22-23).  Plaintiff stated that he sleeps most of the day.  (Id.).

Plaintiff testified that he is able to reach up a little above head level with his left, non-

dominant arm.  (Tr. 24).  Plaintiff stated that he was able to lift eighty pounds several times a day,

although his left hand occasionally gives out.  (Id.).  Plaintiff stated that he was unable to lift

overhead with his left hand.  (Id.).

The ALJ examined vocational expert Vincent Stock.  The ALJ asked Mr. Stock to assume

a hypothetical claimant with plaintiff's characteristics and the following limitations: able to

perform medium work; never climb ropes, ladders, and scaffolds; reaching in all directions is

limited to frequent not constant with the left non-dominant arm; and avoid concentrated exposure

to unprotected heights and excessive vibration.  (Tr. 26).  Mr. Stock testified that the individual

would be able to perform plaintiff's past work as a bail bondsman, and his past work as a laborer

as it is ordinarily performed in the national economy, but not the way plaintiff performed it.  (Id.).

The ALJ next asked Mr. Stock to assume the same limitations as the previous

hypothetical, but the individual is limited to light work.  (Id.).  Mr. Stock testified that the bail

bondsman agent position would still be available, but the individual would not be able to perform

the laborer position.  (Id.).

The ALJ then asked Mr. Stock to assume the same limitations as the second hypothetical

with the added limitations that any job must allow for occasional unscheduled disruptions in the

- 5 -

workday and workweek secondary to pain distraction, his effects of medications and to lie down for extended periods of time during the day.  (Id.).  Mr. Stock testified that there would be no jobs that such an individual could perform.  (Tr. 27).

Plaintiff's attorney next examined Mr. Stock, who testified that employers generally allow employees to take narcotic pain medication as long as it helps them perform their duties and does not cause major side effects.  (Id.).  Mr. Stock stated that it would be problematic if the employee had to drive machinery.  (Tr. 28).

**B.    Relevant Medical Records**

The record reveals that plaintiff arrived at Barnes-Jewish Hospital via ambulance on April 24, 2007, with stab wounds to the left side of the face.  (Tr. 231).  A significant amount of blood was lost at the scene and plaintiff was noted to be clinically intoxicated and uncooperative.  (Id.).  A drug screen was positive for benzodiazepines and ethanol.  (Tr. 238).  Testing revealed a comminuted fracture of the left mandible[5] and a pseudoaneurysm.[6]  (Tr. 240).

On May 9, 2007, plaintiff underwent an open reduction and internal fixation of left mandible, performed by an oral surgeon.  (Tr. 251).  Plaintiff also underwent a simultaneous repair of the pseudoaneurysm, which was performed by an ENT.  (Tr. 253).

Plaintiff was admitted at Barnes-Jewish Hospital from May 22, 2007, through May 25, 2007, with a wound infection.  (Tr. 158).  Plaintiff complained of facial pain, and drainage in the wound.  (Tr. 159).  Plaintiff was treated with intravenous antibiotics, and continued to improve.

---

[5]A U-shaped bone forming the lower jaw.  Stedman's at 1150.

[6]Pulsating, encapsulated hematoma in communication with the lumen of a ruptured vessel. Stedman's at 1588.

(Id.).

Plaintiff presented to the emergency room at Barnes-Jewish Hospital on May 28, 2007, with complaints of increased facial pain.  (Tr. 180).  Plaintiff was diagnosed with abscess/cellulitis[7]-face.  (Id.).

Plaintiff was seen at the BJC ENT Clinic on June 26, 2007, at which time plaintiff reported that he was still having significant pain.  (Tr. 639).  Plaintiff had no fever or drainage. (Id.).  The assessment of the examining physician was post-operative pain that does not appear infectious at this time; is likely swelling related.  (Id.).

Plaintiff was hospitalized at Barnes-Jewish Hospital from June 29, 2007, through July 10, 2007, for a hardware infection.  (Tr. 155).  Plaintiff complained of continual pain and swelling on the left side of his face and continual difficulty with oral intake.  (Id.).  Plaintiff underwent surgical removal of the hardware.  (Tr. 156).  Plaintiff complained of significant subjective pain post-operatively, and pain management was consulted to help in managing his pain.  (Id.).  Plaintiff's swelling decreased somewhat but not entirely.  (Id.).  Plaintiff was able to tolerate oral intake. (Id.).  Plaintiff was discharged home on postoperative day five.  (Id.).  Plaintiff's discharge medications were Morphine,[8] Tylenol, Neurontin, MS Contin,[9] and Augmentin.[10]  (Id.).  Plaintiff

---

[7]Inflammation of subcutaneous, loose connective tissue.  Stedman's at 343.

[8]Morphine is indicated for the relief of moderate to severe pain requiring continuous, around-the-clock opioid therapy for an extended period of time.  See PDR at 1772.

[9]MS Contin is indicated for the management of moderate to severe pain when a continuous, around-the-clock opioid analgesic is needed for an extended period of time.  See PDR at 2586.

[10]Augmentin is indicated for the treatment of infections.  See PDR at 1328.

was instructed to perform activities as tolerated, and follow-up in the ENT Clinic in one week.
(Id.).

Plaintiff presented to the ENT Clinic on July 16, 2007, at which time he reported that the
swelling had improved somewhat but he still had significant pain.  (Tr. 638).  The assessment of
the examining physician was post-op removal mandible hardware for infection, still moderate
edema, severe pain.  (Id.).  Plaintiff's pain medications were continued.  (Id.).  On August 7,
2007, plaintiff continued to report persistent pain, but indicated that the swelling had gotten a
little better.  (Tr. 637).  Plaintiff's pain medications were continued.  (Id.).

Plaintiff presented to the emergency room at Barnes-Jewish Hospital on September 12,
2007, with complaints of severe face pain.  (Tr. 610).  Plaintiff reported that he had been doing
well until two days prior, at which time he experienced increased pain and swelling to the left
face.  (Tr. 613).  It was noted that plaintiff requested Dilaudid[11] and Neurontin by name.  (Id.).
Plaintiff's physical exam revealed mild swelling of mandible with no erythema.  (Id.).  Plaintiff was
discharged, and was prescribed Vicodin[12] for pain.  (Tr. 614).  Plaintiff was given a work note, in
which it was indicated that he could return to work in two days.  (Tr. 618).

Plaintiff was admitted at DePaul Health Center from December 26, 2007, through
December 28, 2007, with complaints of left jaw swelling and pain.  (Tr 328).  It was noted that
plaintiff had a history of noncompliance.  (Id.).  Plaintiff reported increasing swelling in the left
jaw for the past two days.  (Id.).  A CT scan of the maxillofacial bones did not reveal any change.

---

[11]Dilaudid is a narcotic analgesic indicated for the treatment of moderate to severe pain.
See WebMD, http://www.webmd.com/drugs (last visited September 18, 2012).

(Id.).  Plaintiff was diagnosed with jaw pain, history of left jaw osteomyelitis;[13] and hypertension,

patient is "really noncompliant with medications."  (Id.).  Plaintiff was placed on IV antibiotics,

Vicodin for pain, and Norvasc for his hypertension.  (Id.).  Michael J. Kennedy, M.D. examined

plaintiff on December 27, 2007.  (Tr. 338-39).  Dr. Kennedy diagnosed plaintiff with chronic left

mandibular osteomyelitis, status post hardware removal; chronic left jaw pain/suspect narcotic-

seeking behavior; and hypertension.  (Tr. 339).  Dr. Kennedy discharged plaintiff to home with

home IV antibiotics as previously ordered.  (Id.).

Plaintiff presented to DePaul Hospital on January 21, 2008, with complaints of left facial

pain and edema that started several days prior.  (Tr. 428).  Plaintiff was taking IV antibiotics at

home through home health services.  (Id.).  Plaintiff had a history of hypertension but was

noncompliant with treatment.  (Id.).  It was noted that home health and the BJC clinic had

stopped seeing and assisting plaintiff secondary to multiple missed appointments and

noncompliance with medications.  (Id.).  Plaintiff was diagnosed with left mandible osteomyelitis.

(Id.).  Plaintiff was advised to follow-up with the clinic and comply with the treatment plan.  (Id.).


Plaintiff presented to Barnes-Jewish Hospital on February 6, 2008, with complaints of

facial pain.  (Tr. 593).  Plaintiff reported that he did not follow-up with the surgery clinic, and that

he did not use pain medications at home.  (Tr. 598).  Plaintiff was diagnosed with neuralgia,

inflammation of the jaw, and mandible pain.  (Tr. 603).  It was noted that plaintiff's compliance

with his pain management was questionable.  (Id.).  Plaintiff was advised that he could not keep

getting his pain medications from the emergency department.  (Tr. 601).  Plaintiff agreed to

---

[13]Inflammation of the bone marrow and adjacent bone.  Stedman's at 391.

follow-up with the clinics.  (Id.).  Plaintiff was given a work excuse for one day.  (Tr. 604).

Plaintiff presented to the BJC ENT Clinic on February 19, 2008, for a follow-up regarding his face tissue injury.  (Tr. 635).  Plaintiff complained of chronic left facial pain, and indicated that he was out of medication.  (Id.).  Plaintiff reported that he was discharged from the DePaul clinic for missing too many appointments.  (Id.).  Upon examination, no evidence of osteomyelitis was found.  (Id.).  It was noted that plaintiff had a referral to Medicine Wohl, and that he could hopefully receive pain management treatment there.  (Id.).  Plaintiff was offered one final prescription for pain medication, but he was required to sign a pain contract that stated it would be the last pain medication prescription ever from the office and that all future pain medications would be from his primary care provider/pain management team.  (Id.).  Plaintiff refused to sign and was given no pain medication.  (Id.).

Plaintiff presented to the emergency room at DePaul Hospital on February 21, 2008, with complaints of left jaw pain.  (Tr. 419).  Plaintiff reported that he was an investigator and has to leave town frequently, so he missed follow-up appointments.  (Id.).  He indicated that he had an appointment with an internal medicine doctor the next month, although he was unable to supply the doctor's name.  (Id.).  Upon examination, no signs of an infection were found.  (Tr. 420-21).  Plaintiff was found to have more of a chronic condition.  (Tr. 421).  Plaintiff was given a prescription for Vicodin, and was encouraged to follow-up at Barnes, and with Dr. Philip Zinser.  (Id.).

Plaintiff presented to the emergency department at Barnes-Jewish Hospital on March 2, 2008, with complaints of facial pain.  (Tr. 583).  No abnormalities were noted on examination.

- 10 -

(Tr. 585-86).  Plaintiff's diagnoses were malingerer[14] and mandible pain.  (Tr. 588).

Plaintiff presented to the emergency department at Barnes-Jewish Hospital on May 19,

2008, with complaints of facial pain that was so severe he could only tolerate liquids.  (Tr. 568).

Plaintiff was diagnosed with head and face pain.  (Tr. 580).  He was instructed to follow-up at the

Wohl Clinic.  (Tr. 581).

Plaintiff presented to the emergency room at DePaul Hospital on May 31, 2008, with

complaints of left jaw pain.  (Tr. 409).  It was noted that plaintiff had multiple visits for the same

complaint, and poor compliancy regarding follow-up.  (Id.).  Upon examination, no facial swelling

or erythema was noted.  (Tr. 410).  Plaintiff underwent x-rays and lab work, which did not reveal

evidence of osteomyelitis.  (Tr. 412).  Plaintiff was diagnosed with chronic left jaw pain, and was

instructed to follow-up with his doctors at Barnes and Dr. Zinser.  (Id.).

Plaintiff presented to the emergency department at Barnes-Jewish Hospital on August 5,

2008, reporting that he had a fever of 108 degrees.  (Tr. 563).  It was noted that plaintiff was

reading his thermometer wrong, and that his temperature was 99.4 degrees.  (Tr. 564).  Plaintiff

walked out during his examination when he was told that his temperature was 99.4 degrees.  (Id.).

Plaintiff presented to the Washington University Neurology Clinic on September 2, 2008,

with complaints of a shooting, electric pain in the left face that had been present since his stabbing

one year prior.  (Tr. 632).  Plaintiff also reported numbness in the left face.  (Id.).  Upon

_____

[14]Feigning illness or disability to escape work, excite sympathy, or gain compensation.
Stedman's at 1147.

examination, left sided scapular winging[15] was noted.  (Tr. 633).  Plaintiff was diagnosed with traumatic trigeminal neuropathy[16] with lancinating[17] pain, and scapular winging.  (Tr. 634). Additional testing was recommended.  (Id.).

Plaintiff underwent electromyeography on September 8, 2008 due to complaints of numbness over the left side of the face and difficulty in lifting the left arm.  (Tr. 649).  The study showed denervation compatible with left accessory neuropathy,[18] and revealed no electrodiagnostic abnormalities to support motor neuron disease.  (Id.).

Plaintiff underwent an MRI of the brain, face, and neck on September 9, 2008.  (Tr. 660). The MRI of the brain was normal.  (Id.).  The MRI of the neck revealed mild degenerative disease in the cervical spine.  (Id.).

Plaintiff presented to the emergency department at DePaul Hospital on October 11, 2008, with complaints of left jaw pain.  (Tr. 396).  It was noted that plaintiff's chart revealed that he had been to multiple emergency rooms for the same complaints without fever and had been deemed worrisome for narcotic-seeking behavior.  (Tr. 400).  Plaintiff had been given scripts for narcotics in July, August, and September, all written by different providers from the BJC ER.  (Id.). Plaintiff reported that he had an appointment with a pain management specialist the next month. (Id.).  Plaintiff was diagnosed with left mandibular pain.  (Id.).

---

[15]Condition in which the shoulder blade protrudes from the back.  See Stedman's at 2152.

[16]A disorder of the trigeminal nerve, which results in pain.  The trigeminal nerve runs along the face.  See Stedman's at 1313, 2032.

[17]Denoting a sharp cutting or tearing pain.  Stedman's at 1046.

[18]Disorder of the accessory nerve, which is the nerve that controls specific muscles of the shoulder and neck.  See Stedman's at 1293.

On October 29, 2008, plaintiff was treated at DePaul Hospital for a right hand injury due to punching someone on October 10, 2008.  (Tr. 386).  Plaintiff was diagnosed with a boxer's fracture.  (Id.).

Plaintiff presented to the Washington University Neurology Clinic on November 4, 2008, with complaints of facial pain.  (Tr. 626).  Plaintiff was diagnosed with traumatic trigeminal neuropathy with lancinating pain, and scapular winging.  (Tr. 627).  Plaintiff was prescribed Tegretol, and was referred to a primary care physician.  (Id.).

Plaintiff presented to the emergency department at Barnes-Jewish Hospital on January 2, 2009, with complaints of traumatic facial pain.  (Tr. 553).  Plaintiff reported that he had fallen the previous night while intoxicated and suffered a small abrasion to his upper lip.  (Tr. 558). Plaintiff's occupation was listed as laborer.  (Tr. 559).  Plaintiff was diagnosed with neuralgia,[19] head and face pain, and face abrasion.  (Tr. 561).  Plaintiff was given a work note in which it was indicated that plaintiff could return to work the next scheduled shift.  (Id.).

Plaintiff presented to the emergency department at Barnes-Jewish Hospital on January 3, 2009, with complaints of facial pain.  (Tr. 546).  Plaintiff was diagnosed with atypical face pain. (Tr. 550).  He was prescribed Tegretol and was advised to follow-up at the neurology clinic. (Id.).

Plaintiff returned to the emergency department at Barnes-Jewish Hospital on January 18, 2009, with complaints of facial pain and swelling.  (Tr. 538).  Plaintiff was diagnosed with neck pain and atypical face pain.  (Tr. 542).  Plaintiff underwent a regional nerve block.  (Id.).  Plaintiff

_____

[19]Pain of a severe, throbbing, or stabbing character in the course or distribution of a nerve. Stedman's at 1307.

- 13 -

was instructed to follow-up with the Barnes-Jewish ENT Clinic.  (Tr. 543).

Plaintiff was admitted at DePaul Health Center on January 22, 2009, due to complaints of increasing left facial pain and swelling.  (Tr. 460).  It was noted that plaintiff was not taking any prescribed medications due to follow-up issues, and that plaintiff was working as a private investigator.  (Id.).  On January 26, 2009, plaintiff's MRI was unremarkable, and clinically he was doing better.  (Id.).  Plaintiff was diagnosed with left facial cellulitis.  (Id.).  Plaintiff was instructed to follow-up with ENT at Barnes, and follow-up with a primary care physician.  (Id.).

On February 16, 2009, plaintiff arrived at Barnes-Jewish Hospital via ambulance after being involved in a motor vehicle accident.  (Tr. 492).  Plaintiff smelled of alcohol and had slurred speech.  (Id.).  Plaintiff complained of left-sided face pain.  (Tr. 502).  Plaintiff was physically and verbally abusive to staff and had to be restrained.  (Id.).  Testing revealed an ethanol level of .292. (Tr. 509).  Plaintiff was diagnosed with acute alcohol intoxication.  (Tr. 514).

Plaintiff was seen at the Neurology Clinic on March 3, 2009, at which time plaintiff reported no improvement since the increase in Tegretol.  (Tr. 622).  Upon physical examination, left sided scapular winging was noted.  (Tr. 623).  Plaintiff was diagnosed with traumatic trigeminal neuropathy with lancinating pain, and scapular winging.  (Id.).  Plaintiff was continued on Tegretol and was started on Lyrica.[20]  (Id.).  Plaintiff was also referred to a primary care physician.  (Id.).

Plaintiff presented to the emergency room at Barnes-Jewish Hospital on March 12, 2009, with complaints of facial pain.  (Tr. 479).  Facial swelling was noted on examination.  (Tr. 483).

---

[20]Lyrica is indicated for the treatment of neuropathic pain.  See PDR at 2527.

Plaintiff was diagnosed with trigeminal neuralgia.[21]  (Tr. 488).  Plaintiff indicated that he had appointments with the pain clinic and the ENT clinic in the next few weeks, and he was advised to keep these appointments.  (Id.).

Plaintiff presented to Barnes-Jewish Hospital on March 17, 2009, with complaints of left jaw pain.  (Tr. 745).  Tom Thomas, M.D. stated that plaintiff had been going to the emergency department and calling on-call physicians for pain medication without "any evidence for this." (Id.).  Dr. Thomas stated that, on plaintiff's last visit, Dr. Obert tried to get a pain contract, but plaintiff refused and walked out.  (Id.).  Dr. Thomas indicated that plaintiff had not seen a primary care provider or pain specialist yet.  (Id.).  Plaintiff was tolerating a regular diet and had no weight loss.  (Id.).  Dr. Thomas indicated that his exam of plaintiff was "benign," and that he did not see "any signs or symptoms for the etiology of pain."  (Tr. 746).  Dr. Thomas recommended that plaintiff see a primary care provider or pain clinic for a pain control regimen.  (Id.).

Plaintiff presented to the emergency department at Barnes-Jewish Hospital on April 9, 2009, with complaints of jaw pain and swelling.  (Tr. 716).  Plaintiff reported that he was scheduled to undergo surgery on his jaw on April 15, 2009, but the pain was too severe to wait. (Tr. 717).  Plaintiff underwent a CT scan of the maxillofacial bones, which revealed a prior left mandibular fracture, and findings consistent with Eagle's syndrome.  (Tr. 729).  Plaintiff was diagnosed with trigeminal neuralgia.  (Tr. 726).

On April 15, 2009, plaintiff underwent a styloidectomy[22] for treatment of pain consistent

_____

[21]Severe bursts of pain in one or more branches of the trigeminal nerve; often induced by touching trigger points in or about the mouth.  Stedman's at 1307.

[22]Removal of the elongated portion of the styloid process.  See Stedman's at 1853.

with Eagle syndrome.  (Tr. 734).

Plaintiff presented to the emergency department at Barnes-Jewish Hospital on May 21, 2009, with complaints of burning pain and numbness on the left side of his face that began days ago.  (Tr. 705).  Plaintiff did not have a primary care provider.  (Id.).  Plaintiff was diagnosed with numbness and atypical face pain.  (Tr. 712).  Plaintiff was instructed to follow-up with the ENT Clinic.  (Tr. 713).

Plaintiff presented to Barnes-Jewish Hospital for a post-operative follow-up on May 28, 2009, at which time he reported that his pain resolved after surgery but it was now returning.  (Tr. 701).  On August 17, 2009, plaintiff reported that his condition remained the same.  (Tr. 698). Plaintiff indicated that he did not take his medication because it made him sleepy and interfered with his work.  (Id.).  Plaintiff's occupation was listed as private investigator/bounty hunter. (Id.).  Plaintiff was diagnosed with traumatic trigeminal neuropathy with lancinating pain, and scapular winging.  (Tr. 699).  Plaintiff's Tegretol was continued and his Lyrica was increased. (Id.).  Plaintiff was referred to ENT for possible surgical correction and/or release.  (Id.).

Plaintiff presented to the emergency department at Barnes-Jewish Hospital on October 7, 2009, with complaints of facial pain.  (Tr. 688).  Plaintiff was diagnosed with head and face pain. (Tr. 692).

Plaintiff was seen at Barnes-Jewish Hospital for a follow-up regarding left trigeminal neuralgia on November 16, 2009, at which time he reported that his pain persisted all the time at a level of four out of ten with fluctuations.  (Tr. 684).  Plaintiff's pain was worse when eating especially hot sauce and mustard.  (Id.).  Plaintiff indicated that he avoided taking his medications because they make him sleepy and interfere with his job performance.  (Id.).  Plaintiff reported

that he had stopped working.  (Id.).  Plaintiff indicated that he did not go to the ENT as referred because he believed they would do nothing for him.  (Id.).  Plaintiff was diagnosed with traumatic atypical facial pain, poorly controlled with medication, and scapular winging.  (Tr. 685).  It was noted that the quality of plaintiff's pain was not typical of trigeminal neuralgia.  (Id.).  Plaintiff's medications were adjusted.  (Id.).

### The ALJ's Determination

The ALJ made the following findings:

1.      The claimant met the insured status requirements of the Social Security Act through June 30, 2007.

2.      The claimant has not engaged in substantial gainful activity since April 25, 2007, the alleged onset date (20 CFR 404.1571 *et seq*., and 20 CFR 416.971 *et seq*.).

3.      The claimant has the following severe impairments of status post stab wound of the face/neck, substance abuse disorder and scapular winging (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals any of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except he could never climb ropes, ladders or scaffolds.  The claimant could frequently, not constantly, reach in all directions or reach overhead with his left arm.  The claimant should avoid concentrated exposure to excessive vibration and unprotected heights.

6.      The claimant is capable of performing past relevant work as a bond agent and as a laborer in the national economy.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.      The claimant has not been under a disability, as defined in the Social Security Act, from April 25, 2007, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 37-46).

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability insurance benefits protectively filed on March 5, 2009, the claimant is not disabled under sections 216(I) and 223(d) of the Social Security Act.

> Based on the application for supplemental security income protectively filed on March 5, 2009, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 47).

## Discussion

### A.     Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

- 18 -

**B.    The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied.  See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or

equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See
20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the
next step which inquires into whether the impairment prevents the claimant from performing his
or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform
the previous work, in consideration of the claimant's residual functional capacity (RFC) and the
physical and mental demands of the past work, the claimant is not disabled.  See id.  If the
claimant cannot perform his or her previous work, the final step involves a determination of
whether the claimant is able to perform other work in the national economy taking into
consideration the claimant's residual functional capacity, age, education and work experience.
See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if
s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains
upon the claimant until s/he adequately demonstrates an inability to perform previous work, at
which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform
other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants
with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure
must be followed at each level of administrative review.  See id.  Previously, a standard document
entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this
special procedure, had to be completed at each level and a copy had to be attached to the ALJ's
decision, although this is no longer required.  See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e),
416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758.  Application of the special procedures required
is now documented in the decision of the ALJ or Appeals Council.  See 20 C.F.R. §§ 404.1520a

- 20 -

(e), 416.920a (e).

**C.      Plaintiff's Claims**

Plaintiff, who is proceeding pro se, raises the following claims: (1) the ALJ erred in

ignoring medical evidence; (2) the ALJ erred in finding that plaintiff's subjective allegations are

not self-proving; (3) the ALJ failed to explain the weight given to the medical opinions; (4) the

ALJ erred in discussing plaintiff's medication compliance; and (5) the ALJ erred in discussing the

side effects of plaintiff's medications.  The undersigned will discuss plaintiff's claims in turn,

beginning with the ALJ's credibility analysis.

**1.      Credibility Analysis**

Plaintiff argues that the ALJ erred in several respects when determining the credibility of

plaintiff's subjective complaints of pain and limitation.  Defendant contends that the ALJ made a

proper credibility determination and found that plaintiff's allegations regarding his limitations

were not fully credible.

"While the claimant has the burden of proving that the disability results from a medically

determinable physical or mental impairment, direct medical evidence of the cause and effect

relationship between the impairment and the degree of claimant's subjective complaints need not

be produced."  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  Although an ALJ may

reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make

an express credibility determination detailing reasons for discrediting the testimony, must set forth

the inconsistencies, and must discuss the Polaski factors."  Kelley v. Callahan, 133 F.3d 583, 588

(8th Cir. 1998).  Polaski requires the consideration of:  (1) the claimant's daily activities; (2) the

duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4)

- 21 -

dosage, effectiveness and side effects of medication; and (5) functional restrictions.  Polaski, 739 F.2d at 1322.  Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints.  Id.  The ALJ may discount subjective complaints of pain if inconsistencies are apparent in the evidence as a whole.  Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).

The court finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole. "[T]he question is not whether [plaintiff] suffers any pain; it is whether []he is fully credible when []he claims that [the pain] hurts so much that it prevents h[im] from engaging in h[is] prior work." Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987).  Thus, the relevant inquiry is whether or not plaintiff's complaints that his pain is at a degree of severity that prevents him from working are credible.

In the present case, the ALJ properly pointed out the Polaski factors and other inconsistencies in the record as a whole that detract from plaintiff's complaints of disabling pain. (Tr. 44-46).  The ALJ first acknowledged that, if all of plaintiff's allegations were fully credible, he would not be able to work.  (Tr. 44).  The ALJ, however, stated that plaintiff's allegations regarding his limitations and daily activities are not self-proving, and it must be determined whether plaintiff's allegations are credible to the extent all substantial gainful activity is precluded for at least twelve continuous months.  (Id.).  Plaintiff contends that the ALJ erred in finding that plaintiff's allegations were not self-proving.  Plaintiff's argument lacks merit.  The ALJ properly articulated SSA policy that it is the ALJ's duty to determine the credibility of a claimant's subjective complaints of pain and limitation by applying the Polaski factors.

- 22 -

The ALJ next discussed the medical evidence and found that it did not support plaintiff's subjective complaints.  (Tr. 45).  The ALJ noted that, while plaintiff had a significant traumatic injury to his face and neck, the record does not establish that this has resulted in significant limitation of functioning for twelve consecutive months despite strict compliance with prescribed treatment.  (Id.).  The ALJ stated that plaintiff's scapular winging is a birth defect and not a new problem.  (Id.).  The ALJ also noted that there is no evidence of nerve damage in the shoulder or arm, and that most examinations note all four extremities without edema and moving equally. (Id.).  Additionally, Dr. Thomas, who examined plaintiff at Barnes-Jewish Hospital on March 17, 2009, found no "signs or symptoms for the etiology of pain."  (Tr. 746).  Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility.  See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003).

The ALJ next discussed the side effects of plaintiff's medications.  The ALJ stated that plaintiff's allegations of side effects are not accepted, as there are no records of complaints to physicians in the record that would establish ongoing medication side effects not remediable by medication dosage adjustment.  (Tr. 45).  Plaintiff claims that the ALJ's finding is unsupported by the record.

The record reveals that plaintiff reported at an August 17, 2009 post-operative visit that he did not take his medication because it made him sleepy and interfered with his work.  (Tr. 698).  Plaintiff's medications were adjusted.  (Id.).  At a November 16, 2009 follow-up appointment, plaintiff continued to complain that his medications made him sleepy and interfered

with his job performance. (Tr. 684). The dosages of plaintiff's medications were adjusted, and it was noted that plaintiff's conditions would continue to be managed with medication. (Tr. 685). The examining physician stated that he would "plan dose and medication adjustment according to response." (Id.).

Plaintiff contends that the ALJ erred in finding that plaintiff's side effects could be remedied by dosage adjustments. While plaintiff's physicians did not directly state that his side effects could be eliminated, his physicians consistently adjusted his medications and dosages, and stated that they would continue to do so to achieve the desired results. Plaintiff only complained of side effects from medications on two occasions, as discussed above. As such, the ALJ did not err in finding no evidence of long-term side effects that could not be remedied with medication adjustments.

The ALJ next discussed plaintiff's work history. The ALJ stated that plaintiff has a poor reported work history. (Tr. 45). The ALJ also pointed out that plaintiff has not had reported earnings since 2003, yet there is no doubt that he has been working, as referenced in the medical records. (Id.). Plaintiff testified that he worked, but did not file taxes. (Id.). The ALJ noted that plaintiff has little motivation to work, as his monthly disability payment would be more than many of the years posted on his earnings record. (Id.). The ALJ properly considered plaintiff's poor work history as detracting from his credibility. See Buckner v. Astrue, 646 F.3d 549, 555-56 (8th Cir. 2011) (claimant's sporadic work history prior to his alleged disability date indicated that he was not strongly motivated to work and weighed against claimant's credibility).

Further, the ALJ properly considered evidence in the medical records that plaintiff was working during the period in which he alleged disability. (Tr. 45). For example, plaintiff reported

to an emergency room physician in February 2008 that he missed appointments because he "is an investigator and has to leave town a lot." (Tr. 419, 423). The ability to work on a part-time basis during the time in which a claimant alleges he is disabled is inconsistent with allegations of disability, and may demonstrate an ability to perform substantial gainful activity. See 20 C.F.R. § 404.1571, 416.971; Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994).

The ALJ next discussed the records of plaintiff's alcohol abuse, narcotic drug-seeking, and noncompliance in multiple emergency room visits. (Tr. 45). The ALJ stated that the record is replete with plaintiff's noncompliance. (Id.). For example, the ALJ noted that plaintiff frequently told emergency room doctors that he had an upcoming appointment with his primary care physician or a pain doctor when he had no such appointments.   (Tr. 45, 419, 400, 488).   The record also indicates that plaintiff was often noncompliant with treatment recommendations, including appointments and medications. (Tr. 45, 328, 428, 598, 635, 419, 409, 460, 684).   In addition, the record notes alcohol abuse and narcotic drug-seeking behavior. (Tr. 45, 400, 492, 745). Finally, the ALJ pointed out that plaintiff has been diagnosed as a malingerer, which significantly detracts from his credibility. (Tr. 45, 588).

Plaintiff contends that the ALJ erred in considering his noncompliance with his hypertension medication because he is not claiming disability due to hypertension. Plaintiff's argument lacks merit. First, it was not improper for the ALJ to mention plaintiff's noncompliance with his hypertension treatment. Second, the record is replete with evidence of noncompliance with treatment recommendations relating to plaintiff's jaw impairment, which does relate to his disability claim. Thus, the ALJ properly found that the significant evidence of noncompliance in the record detracted from plaintiff's credibility.

- 25 -

The ALJ next noted that no physician has ever imposed any long-term limitations on plaintiff's functional capacity.  Rather, plaintiff received notes to return to work in either one day, two days, or the next shift.  (Tr. 45-46, 618, 604, 561).  A lack of restrictions imposed by treating physicians is inconsistent with allegations of disabling pain.  See Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996).

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001).  However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints.  See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001).  In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain are sufficient and his finding that plaintiff's complaints are not credible is supported by substantial evidence.

Accordingly, the decision of the Commissioner will be affirmed as to this claim.

**2.   Medical Evidence**

Plaintiff first argues that the ALJ erred in ignoring "uncontroverted medical evidence." (Pl's Brief, p. 19).  Specifically, plaintiff notes that the ALJ did not mention that a September 2008 electromyography report revealed evidence consistent with left accessory neuropathy.  (Tr. 649).  Plaintiff notes that the left accessory nerve controls muscles of the shoulder and neck.

While the ALJ did not address this finding, an ALJ is not required to discuss every piece of evidence submitted.  See Wheeler v. Apfel, 224 F.3d 891, 896 n.3 (8th Cir. 2000) (citing Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).  Further, plaintiff does not indicate how this particular piece of evidence has any effect on the ALJ's determination.  The ALJ found that

- 26 -

plaintiff's status post stab wound of the face/neck and scapular winging were severe impairments. (Tr. 37).  The ALJ further found that these severe impairments would reasonably be expected to cause some of plaintiff's alleged symptoms and would limit plaintiff to medium work, with no climbing ropes, ladders, or scaffolds; and only frequent reaching in all directions or reaching overhead with his left arm.  (Tr. 37).  There is no evidence of any additional limitations caused by plaintiff's left accessory neuropathy.

Similarly, plaintiff contends that the ALJ erred in failing to consider evidence of scapular winging, and degenerative disc disease.  As stated above, the ALJ found that plaintiff's scapular winging was a severe impairment.  As such, plaintiff's claim that the ALJ failed to consider this impairment lacks merit.

With regard to degenerative disc disease, plaintiff underwent an MRI of the neck on September 9, 2008, which revealed mild degenerative disease at the C3-C4 level.  (Tr. 660).  An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities.  Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007) (citing Bowen v. Yuckert, 482 U.S. 137, 153 (1987)).  It is the claimant's burden to establish that his impairment or combination of impairments are severe.  Id.  There is no other evidence in the record of degenerative disc disease.  A single notation of "mild" degenerative disease at the C3-C4 level does not support the presence of a severe impairment, or of any additional limitations resulting from this impairment.

In sum, the ALJ performed a proper credibility assessment and found that plaintiff's allegations of disabling pain and limitations were not credible.  The ALJ found that plaintiff's severe impairments would limit plaintiff to medium work, with no climbing ropes, ladders, or scaffolds; and only frequent reaching in all directions or reaching overhead with his left arm.  (Tr.

- 27 -

37).  There is no evidence of any greater restrictions than those found by the ALJ.  Significantly, no physician imposed any long-term limitations on plaintiff's functional capacity.  Rather, plaintiff was given work excuses for one day, two days, or next shift.  Additionally, plaintiff testified at the administrative hearing that he was capable of lifting eighty pounds.  (Tr. 19).  The ALJ's RFC determination is supported by substantial evidence in the record as a whole.

After determining plaintiff's RFC, the ALJ utilized the assistance of a vocational expert to determine that plaintiff could perform his past work as a bail bondsman and laborer, and that plaintiff was therefore not disabled.  (Tr. 25-26).  Substantial evidence on the record as a whole supports this finding.

## Conclusion

Substantial evidence in the record as a whole supports the decision of the ALJ finding plaintiff not disabled because the evidence of record does not support the presence of a disabling impairment or combination of impairments.  Accordingly, Judgment will be entered separately in favor of defendant in accordance with this Memorandum.


Dated this   24th   day of September, 2012.

_____
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE